PENNSYLVANIA STEEL CO. et al. v. NEW YORK CITY RY. CO. et al.
and three other causes.

In re METROPOLITAN EXPRESS CO.

Nos. 2—9, 2—33, 2—149, and 3—37.

(District Court, S. D. New York.   September 23, 1913.)

1. STREET RAILROADS (§ 49*)—CONSTRUCTION OF LEASE—LIABILITIES OF LESSEE.

A lease of street railroad lines provided that "the lessee shall also from time to time pay or cause to be paid all rentals and other sums of money which are or may be or become due or payable under or by reason of any leases and other contracts to which the lessor is a party or to which

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

any of the demised property is or may be subject, and the lessee assumes all the obligations of the lessor under all such leases and contracts." *Held*, that such assumption clause did not cover the liability of the lessor for breach of a contract to furnish cars and facilities for the use of an express company for which it was to receive instead of to pay rent.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 125, 126; Dec. Dig. § 49.*]

2. STREET RAILROADS (§ 49*)—CONSTRUCTION OF LEASE—LIABILITY. OF LESSEE.

By the habendum clause of a lease of a street railroad system, the lessor demised, inter alia, all its benefits and rights under a contract by which it agreed to furnish cars and other facilities to an express company for a term of years subject to the burdens and conditions imposed on it by such contract. The lease further provided that in case of default by the lessee in payment of rent or performance of any other conditions, continuing for a stated time, it should terminate at once. The lessee performed the contract and received the rental provided therein, until it became insolvent, and receivers were appointed for its property, and the receivers thereafter performed it until the lease was terminated. *Held*, that the assignment of the contract effected by the lease was subject to the forfeiture clause therein to which the express company must be deemed to have assented, and that the lessee was not liable for damages for nonperformance after the lease was terminated.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 125, 126; Dec. Dig. § 49.*]

3. CARRIERS (§ 15*) — CONTRACTS WITH EXPRESS COMPANIES — ACTION FO BREACH—DAMAGES.

Evidence *held* insufficient to establish substantial damages for breach of a contract, by the defendant street railroad company to furnish cars and facilities to an express company for a term of years.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 25–27; Dec. Dig. § 15.*]

This cause comes here on exceptions to a report of Special Master William L. Turner.

See, also, 188 Fed. 339; 198 Fed. 735, 117 C. C. A. 503; 208 Fed. 757, 777.

The following is the opinion of the special master:

This claim was remanded by the Circuit Court of Appeals with instructions to allow it for nominal damages and for such substantial damages as upon further hearing might be established. These instructions are to be interpreted in the light of the principles expressed in the opinion of the court as to the nature and extent of proof required to establish damages and of the answering proofs. The opinion (198 Fed. 745), so far as it relates to the damages, is as follows; the italics being mine:

"In the present case it is manifest that the contract was entered into with a view of future profits. That was its object. It looked to the increase and development of the business. Although the claimant did not find the contract profitable when it operated it itself, it is apparent that it contained such elements of prospective value that a responsible corporation was willing to take it off its hands and guarantee a large profit. It appears also that this corporation actually found the contract profitable, *for it made nearly $30,000 a year out of it for the three years prior to the receivership.*

"It may be that, standing by itself, the terms of the contract with the third person—the American Express Company—would not afford a measure of its value. The assignment might overestimate or underestimate and would not be binding. The contract, however, permitted an assignment *and the fact that it was assigned at a substantial profit tended to show that it had a salable value. There was evidence of substantial damage.*

*For other cases, see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"It is no reason for denying the claimant damage that some years before the receivership it operated under the contract at a loss. Nor is there any justification for limiting it to such profits as it might show that it could make under its own management. As already stated, the contract permitted assignment and it was assigned. *The assignees made large profits.* Prima facie they would have continued at the same rate, *and it was for the receivers to show that such conclusion did not follow,* and that they arose from peculiar facilities of the American Express Company, as distinguished from other possible assignees, not within the contemplation of the parties when they made the agreement and authorized its assignment.

"The claimant *limits its claim for damages to reimbursement for its loss through the termination of the assignment agreement with the American Express Company, and, consequently, the damages assessed cannot exceed such amount.*"

This is clearly a determination that the evidence then before the court made out a prima facie case for damages for the full amount claimed. That same evidence, somewhat amplified, is again before the court. The Metropolitan receiver has not attempted to meet it in any of the ways pointed out in the opinion, but so far as the amount of profits is concerned rests the case upon a criticism of the method adopted in ascertaining them. That method is, however, the identical method which was before the court when it said that the American Express Company made nearly $30,000 a year out of the contract for the three years before the receivership. It must, I think, be assumed that every criticism made or which might have been made of that method was disposed of by the court in favor of the claimant and that the matter has been sent back not for the purpose of giving it an opportunity to supply any defects in its own proofs, but for the purpose of permitting the receiver to submit countervailing proofs. Clearly the claimant is under no obligation to submit new or additional proof of damages as part of its main case, and just as clearly the criticism of counsel for the Metropolitan receiver, which so far as it is destructive of the claimant's proofs of the amount of damage is a mere denial of their legal sufficiency, must be held to have been resolved in claimant's favor.

Even, however, if claimant's method of ascertaining the terminal expense were open to examination—and it is the only factor in the determination of profits at which criticism is directed—it cannot, as it seems to me, be condemned as legally insufficient. Briefly stated, it consists in applying a percentage—deduced by dividing the total receipts from the services involved in receiving and forwarding express matter in a given locality into the actual expenditures for terminal facilities in that locality—to that portion of such gross receipts from any particular part of the business done there that may be under examination. Experience extending over 20 years had shown that the terminal expense of the American Express Company in the city of New York determined in this way was something less than 30 per cent. As the local business (i. e., wholly in Manhattan and the Bronx) done over Metropolitan lines during its period of operation which furnished fully 90 per cent. of its gross receipts from that source, involved two termini within the locality the American Express Company doubled this percentage and deducted 60 per cent. of such gross receipts for terminal expenses. Pointing out that the evidence shows that the through packages and the trolley packages were handled indiscriminately by the same wagons, men, and office equipment, counsel insists that as this method gives the trolley business the benefit of the larger gross receipts of all other business done by the American Express Company in this locality, it is not only arbitrary and uncertain, but obviously illogical and incorrect. That the Metropolitan express matter was intermingled with the other matter is, of course, the reason why some basis of apportioning has to be suggested, and it is obvious that any theory is open to the charge of inexactness. An alternate theory suggested by the receiver is that the trolley business should be charged with the same average terminal cost per package as the other business, but this is not convincing. It would put the grand piano and the hand-satchel on a basis of equality so far as cost of moving goes. It may or may not suggest a closer approach to exactness than the one

adopted does, but no one can say that such result must follow. The theory adopted, while obviously not exact, is the method used for years by this company as well as others in making comparative estimates of its profits from business done in localities scattered throughout the world, and the evidence shows that it used it for its own purposes in making estimates of the profits from this very Metropolitan business long before litigation threatened and that it then accepted the result as profitable. Moreover, it has, I think, the sanction of authority, for the courts have sustained contentions that profits for which the contending party would otherwise be accountable may be diminished by charging the profit derived from the unlawful part of the business with a pro rata of expenses determined by applying the ratio of expenses to receipts for the entire business. Tremaine v. Hitchcock, 23 Wall. (90 U. S.) 518, 23 L. Ed. 97; Cutter v. Gudebrod Bros. Co., 190 N. Y. 252, 83 N. E. 16.

In these cases the ruling was obtained at the instance of the offending party and surely it may be invoked by the party aggrieved. Then, too, the margin between the $30,000 of yearly profit determined in this way, to which the claimant might have been entitled under the rule of damages which controls, and the $10,000 per annum to which it is limited by its demand, suggests a leeway sufficient to offset much inexactness in any calculation that might be suggested.

It was developed on cross-examination of claimant's witnesses that of the nine express stations in Manhattan and the Bronx used during the time that the express companies were operating under the contract, four were owned by the Metropolitan Express Company and one leased by the American Express Company, and that these five stations were connected with the tracks on which they abutted by spurs which were constructed by the railroad company owning such tracks or its lessee. They were devoted exclusively to express business while the other four were railroad depots in the sense in which that term is understood, similarly connected, in which the Express Companies were given accommodations. It is insisted, on the authority of Hatfield v. Straus, 189 N. Y. 208, 82 N. E. 172, that the spurs into these first five stations were illegally constructed and a nuisance, and on the strength of this assumption of law it is argued that the absence of legal authority to use the spurs necessarily impairs the right to damages for breaches of the contract and that such damages may not be awarded on the theory that these nuisances would be allowed to continue. The criticism is not leveled at any of the four spurs running into railroad depots, although those depots were in part used in connection with the express business. This is an altogether new answer to the demand of claimant, not suggested by anything contained in the record before the Appellate Court, and I have much doubt as to whether it is within the narrowed scope of the inquiry which it has directed; but it is very earnestly and fully urged by counsel for the Metropolitan receiver and discussed in the answering briefs on the theory that it is open for decision, and for that reason I express an opinion concerning it.

Counsel concedes that the railway companies constructing and maintaining the spurs into three of the five express stations which abut on the lines of such companies possess a franchise to move express matter as well as passengers, but denies that the Ninth Avenue Railway Company on the lines of which the express station at 178 Washington street abuts and the Union Railway Company as to its Webster Avenue franchise enjoy such privilege. With reference to the companies whose franchise is conceded, the contention amounts to this: That Hatfield v. Straus decides that a railway corporation possessing a legislative grant to construct in a city a railway with the necessary connections to which the consent of the local authority required by the Constitution has been given, over which property as well as passengers may be moved may not connect abutting premises devoted exclusively to the freight or express business of the company by the spur track necessary to the convenient transaction of such business and that such a spur is an unauthorized nuisance. I do not think that the Straus Case decides anything of the kind. That case decides that a private individual—owner of a great department store—may not, without or with the consent of local authorities, in this case the board of estimate and apportionment of the city of New York, for his

private purposes construct and maintain a spur in the public street which is reserved exclusively for public purposes, connecting his property with the tracks of the railway company on which it abuts, although that company possess the privilege of moving freight and desires the connection. This is a very different thing from saying that a street railway company enjoying the privilege and subject to the duty of moving freight may not connect its track with such building or buildings as may be reasonably necessary for the transaction of its freight business. The duty that the carrier owes is a public duty and the incidental use of the street a public use as distinguished from the private use condemned in the Straus Case. That case both in the Appellate Division and in the Court of Appeals presents much conflict of opinion, but neither in the Appellate Division nor in the Court of Appeals, except possibly in the opinion of Judge Bartlett, who as to it spoke only for himself, is the right of street railways to move freight questioned, for in the dissenting opinion of the higher court written for three of its members it is asserted and in the prevailing opinion conceded. Given the power, the connections necessary to its reasonable exercise surely go with it and, what is more, the consent of local authorities to the construction of lines by a company possessing such power is in my opinion a consent to just such connections. The right to them would be implied if it were not expressed. Its denial would mean the loading of freight cars and storage of freight on the street itself—a reductio ad absurdum.

The question suggested as to the charter powers of the Ninth Avenue Company and Union Railway Company is raised to establish the illegality of the connection with the Washington or Dey Street station and with the Webster Avenue station in the Bronx of which the American Express Company was lessee, and the evidence shows that the express business done between these stations constituted a large if not the larger part of the total business done. I think that there is no question as to the power of the Union Railway Company upon whose lines in the Bronx the Webster Avenue station abutted to move freight matter over its tracks on Webster avenue. That power is expressly given by subdivision 7 of section 28 of the Railroad Act of 1850 with which power thus conferred the Union Railway Company is expressly vested by the act incorporating it (chapter 361 of Laws of 1863). Section 34 of the Railroad Act, from the operation of which that company is excepted by the later act, simply relieves it from the obligation to carry the mails, but does not deprive it of the power to move freight as the receiver urges. Respecting the assertion that the Ninth Avenue Railway Company lacks this power, it is by no means clear that it does not possess it; but there are controlling considerations why the question should not be passed upon collaterally. The evidence shows that the spur is there under color of right and put there by the Metropolitan Street Railway Company itself. It has been maintained since 1900 both by that company, its lessee, and the receivers themselves, and there is no evidence that the right to maintain it has ever been questioned by authority state or local or by any adjoining owner. The Ninth Avenue Company is not a party to this proceeding. Under such circumstances I do not think that the federal court will assume the occupation to be otherwise than lawful. The law of the state is that the usurpation of a franchise or its unlawful exercise or under color of right may not be collaterally questioned (Lamming v. Galusha, 151 N. Y. 648, 45 N. E. 1132), and where, as here, property rights are involved, such rule is strictly regarded by the federal courts (Burgess v. Seligman, 107 U. S. 20, 2 Sup. Ct. 10, 27 L. Ed. 359).

In the footnote to the statement of facts, made by the Appellate Court, attention is called to the fact that the contract between the two express companies covered other contracts than that between the Metropolitan Railway and the Express Companies, and it is said that it was assumed from the presentation of the case that that was the only one of substantial value. It is also said that if the assumption is incorrect a complication would arise to be dealt with on this hearing. Among the contracts referred to are the so-called subsidiary contracts between the Metropolitan Express Company and the five railroad companies in the Bronx and between that company and the Forty-Second Street, etc., Railway Company in Manhattan. I do not understand from his brief that counsel for the City receiver contends that the

contracts assigned other than these had any value, and the claimant has affirmatively shown, I think, that they had not; but he does contend that the subsidiary contracts had very great value, notably that with the Union Railway Company in the Bronx, and that as the $10,000 per annum promised in consideration of the assignment of the contract is not apportioned either by the contract or by any evidence offered, claimant's demand must fail. By the original contract, however, the Metropolitan Railway Company grants the Express Company "to the fullest extent that it can lawfully do so" the exclusive right to do the express business over its lines, and it defines them as "all main lines, branches leased and controlled lines." These "subsidiary" contracts were with companies "controlled" by stock ownership at the time of the making of this contract on March 4, 1901, and the Railway Company undertook to give an exclusive right for the contract period over these lines as clearly as it did over those it owned or leased; it being agreed to pay the $10,000 for the privilege over such lines as well as over the others which suggest no dispute. The contracts were, I think, subsidiary to this main contract and such as either the Metropolitan or later the City Company was bound by its agreement to secure if it became necessary to do so, and that, it would seem, was the reason why the Metropolitan Railway Company did secure them.

The remaining contention urged by counsel for the City receiver is that the City Company is not responsible for the breach as the contract was really repudiated by the Metropolitan receivers subsequent to any date that the covenants in the lease can be held to bind the City estate; but I think that the opinion of the Circuit Court of Appeals disposes of this contention adversely. It clearly holds that the claim is not contingent and that the breach occurred on September 24, 1907, when the receivers of the City Company were appointed.

Claimant asks that a ruling be suggested to the court that the City Company became primarily and the Metropolitan Company secondarily responsible for the performance of the contract. This suggests a question which was not argued before the Circuit Court of Appeals and for which no rule was laid down for the guidance of the court below, and which was not argued pro et contra on this hearing. It turns upon the question whether the City Company's liability springs from the assumption clause, which, in its statement of facts, the court cites as the basis of the City Company's liability. That that or some clause imposed upon the City Company's liabilities respecting the contract was assumed by counsel and the court for the purposes of that appeal, but that the relative liability of the two estates was left for decision, seems to be clear from the footnote at the end of the opinion. Thus Judge Noyes says: "That no substantial question is raised in the brief as to there being any difference in the liability of the two estates upon the contract in question and that matter is accordingly not discussed." If, then, this is to be regarded as an intimation that the matter is still open and I am permitted to express an opinion concerning it, I should say that the contract is not within the assumption clause at all. That clause reads as follows:

"The lessee shall also from time to time pay or cause to be paid all rentals and other sums of money which are or may be or become due or payable under or by reason of any leases and other contracts to which the lessor is a party or to which any of the demised property is or may be subject and the lessee assumes all the obligations of the lessor under all *such* leases and contracts * * * provided that the lessee shall not be required to pay the principal of any funded obligations of the lessor or of its subsidiary companies except as hereinafter provided."

The contract in question does not call for the payment of any sums of money whatever by the Metropolitan Railway Company, lessor, by way of rental or otherwise and is surely not within this language. The "obligations" assumed are "under *such* leases and contracts," i. e., as require the payment of rentals and other sums of money. The Metropolitan was to receive money, not to pay it. As Judge Noyes points out, the breach of this contract is "like the case of a lessor (not lessee) whose trustee drives the tenant out of possession and then insists that the lease was never broken." The obligation of the Railway Company was to furnish cars and transit facilities over its lines, but not to pay money, and that obligation is certainly not within a covenant

which the Appellate Court has recently construed to be essentially a rent covenant. Matter of Hemphill v. N. Y. City Railway Co., 204 Fed. 513. The liability of the City Company is to be sought in other language of the lease and is apparently contained in the habendum clause which grants, leases, and demises "all the benefits and rights arising from all and any contracts, leases and agreements which the lessor now has * * * all of which franchises, rights, powers, privileges, contracts, leases, agreements and other property so leased are subject to the various burdens and conditions by which they are held by the lessor." The contract in question provides that "it shall bind the successors, assigns, lessees and transferees respectively," and the Metropolitan-City lease clearly operates as an assignment of the contract, subject as stated. Such assignment the City Company by furnishing the facilities and receiving the payments, and the Express Company by using the facilities and making the payments, accepted, until the assignment terminated. The assignment was, however, subject to the right of the Metropolitan to terminate it and to re-enter upon the properties covered by the lease and contract which is contained in paragraph 21 of the lease and of this right the Express Company must be deemed to have had full knowledge when it accepted the City Company as lessee and assignee of the Metropolitan Railway Company. That clause is as follows:

"In case the lessee shall fail at any time to pay the rent provided for in this indenture of lease, or any part thereof, as the same shall accrue, or shall fail at any time to keep and perform any of the agreements or covenants contained in this indenture of lease, and any such default in the payment of rent or in the performance of the covenants hereof shall continue for the period of twelve months after written demand and notice from the lessor to the lessee, then and in any such case, at the option of the lessor, the estate hereby demised shall cease and determine, and all right, title and interest of the lessee in the railroads and premises hereby demised and the leases hereby assigned, shall absolutely cease and determine; and the lessor shall thereupon become and be entitled to re-enter into and upon the railroads and premises hereby demised, and from thenceforth to have, hold, possess and enjoy the same and every part thereof, as of its first and former estate therein, anything to the contrary herein contained notwithstanding, which right shall not be affected by any waiver of a prior default by implication or agreement, and no re-entry by the lessor shall impair the claims of the lessor for any rentals and other payments hereunder which shall be due and unpaid. The right of re-entry for default shall not, however, extend to any of the property hereby transferred absolutely to the lessee."

Very early in these proceedings Judge Lacombe said, on the authority of the Quincy Case (145 U. S. 82, 12 Sup. Ct. 787, 36 L. Ed. 632), that the year's period of grace here reserved would be deemed to have been waived and that the court would not have hesitated to have authorized a re-entry before its expiration at the demand of the lessor. More recently the Circuit Court of Appeals, in the "Termination of Lease" proceeding (198 Fed. 747, 117 C. C. A. 503), decided that after September 24, 1907, the receivers must be held to have been operating for the benefit of the Metropolitan estate, and still more recently the same court has said that as between the parties to the lease all idea of continuing operation under it must have been given up prior to February, 1908. Hemphill v. City Company. This means that prior to that date there was a re-entry under the clause quoted, and by the very terms of the assignment an end of the City Company's liability under the Express Company's contract and a resumption of that of the Metropolitan. Acting upon this latest intimation from the court, I have said in the Second Avenue Company's breach of lease proceeding against the City Company for the reasons there indicated that October 1, 1907, would be suggested as the date when the lease terminated as between the parties, and while that suggestion has not yet been passed upon, the same recommendation will be made here. In any event the date cannot be much later. This means that as by the lease the City Company did not expressly assume the Express Company's contract for the balance of its term, but simply took an assignment of it subject to its conditions and the right of the Metropolitan to re-enter, its lia-

bility respecting that contract ended on October 1st, 1907. Accordingly of the total damage of $129,704.32 sustained by the claimant, the City estate will be liable for that portion suggested by the ratio which the week from September 24, 1907, when the obligation was broken by the appointment of receivers for the City Company, to October 1, 1907, bears to the unexpired term of the contract of 12 years, 11 months and 22 days and the Metropolitan estate will be liable for the balance.

Claimant may present and serve a proposed report in the Metropolitan matter and the City receiver a similar report in the City Company matter on May 27, 1913, exceptions thereto and proposed amendments thereof to be served two days later and passed on at a hearing to be fixed at convenience of counsel.

J. Parker Kirlin, of New York City, for Metropolitan St. Ry. Co.

James L. Quackenbush, of New York City (Jas. T. Mason, of New York City, of counsel), for New York City Ry. Co.

Dexter, Osborn & Fleming, of New York City (M. C. Fleming, of New York City, of counsel), for receiver of New York City Ry. Co.

Byrne & Cutcheon, of New York City (Chas. M. Travis, of New York City, of counsel), for Pennsylvania Steel Co. and Degnon Contracting Co.

Davies, Auerbach & Cornell, of New York City (B. Tolles, of New York City, of counsel), for Guaranty Trust Co. of New York, Second Ave. R. Co., and Lynch, as receiver.

Chas. T. Payne and Geller, Rolston & Horan, all of New York City, for Farmers' Loan & Trust Co.

Geo. N. Hamlin and O'Brien, Boardman & Platt, all of New York City, for committee of contract creditors of New York City Ry. Co.

Charles Benner, of New York City, for committee of tort creditors of New York City Ry. Co.

Simpson, Thacher & Bartlett, of New York City, for committee under Metropolitan St. Ry. Co. stockholders' protective agreement.

Strong & Mellen, of New York City (Mr. Chase, of counsel), for Central Park, N. & E. R. R. Co.

Chas. H. Tuttle, of New York City, for Cornell and Belt Line Ry. Corp.

Richard Reid Rogers, of New York City (Jas. T. Mason, of New York City, of counsel), for Central Crosstown R. Co. and New York Rys. Co.

L. C. Krauthoff and J. P. Cotton, Jr., both of New York City, for committee acting under a plan of reorganization of Metropolitan St. Ry. Co.

Masten & Nichols, of New York City (Arthur H. Masten, of New York City, of counsel), for receiver of Metropolitan St. Ry. Co.

Page, Crawford & Tuska, of New York City (Wm. H. Page and Gilbert H. Crawford, both of New York City, of counsel), for Metropolitan Express Co.

LACOMBE, Circuit Judge. It is unnecessary to rehearse the general statement of facts, they are very fully set forth in the master's opinion.

Apparently, under the opinion of the Court of Appeals when these claims were considered by it, the question whether or not there should be nominal damages awarded is no longer open here. Upon the whole record, however, as it now stands this court is to inquire whether there is sufficient proof to warrant a finding of any particular sum as fairly representing substantial damages sustained by claimant.

[1, 2] In the case of the City Company, this court fully concurs in the master's conclusions that the subject-matter of this claim is not covered by the assumption clause (3) of its lease and that under the habendum clause its obligation to afford facilities for the transaction of the express business of claimant or its assignee continued only until the termination of the lease. The master erred, however, in awarding $192.31 damages against the City Railway Company, being the proportion of what he found to be the whole damages for the week from September 24 to October 1, 1907. For the purposes of this case it

makes no difference whether the date of termination of the lease is taken to be September 24, 1907, or October 1, 1907, or January 12, 1908, when the Third avenue and its leased and controlled roads were cut out of the system, or February 28, 1908, when receivers notified claimant that they would discontinue the operation of express cars, or March 15, 1908, the date fixed by them for such discontinuance. The service stipulated for in claimant's contract was, in fact, fully performed and all it bargained for it received until the last-named date. It may be correct as a legal theory to say that when receivers decline to assume an existing contract, the declination dates back to the day of their own appointment. But it is a very different thing to hold that the other party to the contract sustained actual substantial damage from its breach during the intermediate time when, during that whole time its provisions were being complied with and such party was receiving all that had been promised to it.

The special master's conclusions of law should be modified by substituting for the fourth the following:

"That the claimant is entitled to no more than nominal damages against the New York City Railway Company for the breach of its agreement with the Metropolitan Street Railway Company of March 4, 1901."

In order that no more may be decided on this hearing than is necessary to dispose of this particular claim the last words of the first conclusion of law should be changed from "on October 1, 1907," to "some time prior to February 28, 1908."

The findings of fact need not be modified unless the disposition to be made of the claim against the Metropolitan Company makes it necessary to avoid any discrepancy between the findings in the two cases. The exceptions of claimant to the findings and conclusions are overruled.

[3] In the latter case of the Metropolitan road the Court of Appeals has held that the claimant is entitled to nominal damages, and in addition to such substantial damages as might be shown by satisfactory proof. The special master has found the damages to be $129,704.32, but the testimony does not seem to me to warrant that conclusion. The contract which is the basis of the claim was entered into March 4, 1901, by the Metropolitan Express Company and Metropolitan Railway Company, the latter agreeing for 20 years to furnish cars and give express facilities over its main lines, purchased lines, and controlled lines, and also all lines it might thereafter purchase or acquire control of. Claimant operated under this contract for three years at a loss, and on July 15, 1904, assigned this contract and several others to the American Express Company for a lump sum of $10,000 a year. Testimony was introduced tending to show that for some time before receivership the latter company made a profit out of its operation of about $30,000 a year. There is some criticism as to the sufficiency of this testimony—being in part averages and estimates—but courts are usually liberal when absolute accuracy in such matters is inherently impossible. Upon this evidence the special master has held that the contract was actually worth $10,000 a year for the unexpired term of nearly thirteen years. The difficulty with the calculation lies in its assumption that the $10,000 a year which the American Company agreed to pay was wholly for this contract of

March 4, 1901. That consideration, however, was for the assignment not only of this but also of many other contracts and leases. As to some of these the master has found that they were of no substantial value; but there are others which were undoubtedly of substantial value. As we have seen, the contract of March 4, 1901, covered not only lines owned by the Metropolitan Railway Company, but all "controlled" lines. Among such lines controlled through stock ownership were the Union Railway, Forty-Second Street, Manhattanville & St. Nicholas Avenue Railway, Yonkers Railroad, Southern Boulevard Railroad, Westchester Electric Railroad, and Tarrytown, White Plains & Mamaroneck Railway. The contract of March 4, 1901, contained no covenant that this control of these railroads should continue in the Metropolitan. It may be that while such control still existed the Metropolitan might have been compelled to secure from each of the companies thus controlled a concession to the express company similar to the one it had itself given; but if it parted with the control of either of them it would be powerless to obtain such concession for the express company. To that extent the value of the original contract would shrink and, there being no covenant for a continuance of control, the express company could maintain no claim for damages for such shrinkage. Whether or not the American Company would have agreed to pay $10,000 or $10 a year for the original contract does not appear. Before it took its assignments the weak point in that contract was covered; the controlled companies enumerated above had each of them made an independent contract with the Metropolitan Express Company similar in its terms to the contract of 1901. Thereafter the holder of *all these contracts* was secured in the use for express purposes for the period named, of all the lines which the Metropolitan owned or controlled when the first contract was made. All these later contracts were included with the original one in the assignment to the American Company. The master has not found that these were "of no substantial value"; that they were, some of them at least, of substantial value must be apparent to any one who is familiar with the intricacies of the street railway system in Manhattan and the Bronx. There was no apportionment of the $10,000 among the several parcels covered by the assignment and there is nothing in proof by which such apportionment could possibly be made. It seems to me, therefore, impossible to determine what sum of money would fairly represent the damages resulting from the breach of this contract which stipulated for no continuance of control. For the breaches of their several contracts the roads formerly controlled by the Metropolitan may or may not be responsible, but the finding of substantial damages against the last-named road is not confirmed.

These conclusions call for a disaffirmance of findings of fact numbered 7, 8, 9, and 14 and of the conclusion of law.

The eleventh finding goes too far in holding that the contracts referred to therein "ceased to have any substantial value" upon the breach of the contract with the Metropolitan. The most that can be said is that their value was substantially impaired. The finding should be modified accordingly. In order that all the points raised on the hearing may be disposed of all other exceptions to the report are pro forma overruled.